UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JORGE OLIVA, Individually and On Behalf of All Others Similarly Situated,<br><br>                     Plaintiff,<br><br>    vs.<br><br>TRIVAGO N.V., ROLF SCHRÖMGENS, AXEL HEFER, J.P. MORGAN SECURITIES, LLC, GOLDMAN, SACHS & CO., MORGAN STANLEY & CO. LLC, ALLEN & COMPANY LLC, MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, CITIGROUP GLOBAL MARKETS INC., DEUTSCHE BANK SECURITIES INC., COWEN AND COMPANY, LLC, and GUGGENHEIM SECURITIES, LLC,<br><br>                     Defendants. | Case No.:<br><br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, Jorge Oliva, individually and on behalf of all others similarly situated, alleges the following against Trivago N.V. ("Trivago" or the "Company"), Rolf Schrömgens ("Schrömgens"), Axel Hefer ("Hefer"), J.P. Morgan Securities LLC, Goldman, Sachs & Co., Morgan Stanley & Co. LLC, Allen & Company LLC, Merrill Lynch, Pierce, Fenner & Smith Incorporated, Citigroup Global Markets Inc., Deutsche Bank Securities Inc., Cowen and Company, LLC, Guggenheim Securities, LLC (collectively, "Defendants"), based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties, a review of news articles and shareholder communications, and a review of other publicly available information concerning Trivago, the other Defendants, and related non-parties. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a securities class action on behalf of all investors who purchased or otherwise acquired Trivago's American Depository Receipts ("ADRs") pursuant and/or traceable to Trivago's false and misleading Registration Statement and Prospectus, issued in connection with the Company's initial public offering on or about December 16, 2016 (the "IPO" or the "Offering") and/or on the open market between December 16, 2016 and October 27, 2017, inclusive (the "Class Period"), and seeking remedies pursuant to Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

1

## PARTIES

2.      Plaintiff, Jorge Oliva, purchased Trivago shares during the Class Period as described in the Certification attached hereto and incorporated herein by reference and suffered damages thereon.

3.      Defendant Trivago is a German company headquartered in Düsseldorf, Germany with its principal executive offices located at Bennigsen-Platz 1, Düsseldorf 40474, Germany. Trivago provides an online hotel search platform for customers worldwide.

4.      Defendant Rolf Schrömgens is, and was throughout the Class Period, Trivago's Chief Executive Officer ("CEO").

5.      Defendant Axel Hefer is, and was throughout the Class Period, Trivago's Chief Financial Officer ("CFO").

6.      Defendants Schrömgens and Hefer are collectively referred to herein as the "Individual Defendants."

7.      During the Class Period, the Individual Defendants served as Trivago's executive management and oversaw the Company's operations and finances.    The Individual Defendants were intimately knowledgeable about all aspects of Trivago's financial and business operations. They were also intimately involved in deciding which disclosures would be made by Trivago. The Individual Defendants made various public statements for Trivago during the Class Period, and participated in Class Period investor conferences.

8.      Defendants Morgan Stanley & Co. LLC ("Morgan Stanley"), Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch"), J.P. Morgan Securities LLC ("JP Morgan"), Goldman, Sachs & Co. ("Goldman Sachs"), Allen & Company LLC ("Allen & Company"), Citigroup Global Markets Inc. ("Citigroup"), Deutsche Bank Securities Inc. ("Deutsche Bank"),

Cowen and Company, LLC ("Cowen") and Guggenheim Securities, LLC ("Guggenheim") act as brokers for corporate, government, and institutional clients and as a dealer in the purchase and sale of various financial instruments. Collectively, Morgan Stanley, Merrill Lynch, J.P. Morgan, Goldman Sachs, Allen & Company, Citigroup, Deutsche Bank, Cowen and Guggenheim are referred to herein as the "Underwriter Defendants."

9.     The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters for the Secondary Offering and were negligent in failing to ensure that the Registration Statement and Prospectus were prepared properly and accurately, and free from misstatement or omission.

10.     The Underwriter Defendants all did business within this District in connection with the IPO.

11.     Together, Trivago, the Individual Defendants and the Underwriter Defendants are known herein as the "Securities Act Defendants."

## JURISDICTION AND VENUE

12.     Jurisdiction and venue are proper in this District under Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) because Trivago conducts business in this District, with an office located at 140 Broadway, 46th Floor, New York, NY 10005. Further, the Company's ADRs trade on the NASDAQ Global Select Market ("NASDAQ"), which is located within this District, and substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District.

## BACKGROUND TO THE CLASS PERIOD

13.     Trivago, a subsidiary of Expedia, Inc., is an online hotel search platform that offers price information, reviews, photos, booking, and other travel services. Founded in 2005,

the Company is headquartered in Düsseldorf, Germany and its ADRs trade on the NASDAQ under the ticker symbol "TRVG."

14.     On November 14, 2016, Trivago filed its registration statement on a Form F-1 with the SEC. The registration statement, which included a preliminary prospectus, was amended by the Company on December 5, 2016 and subsequently deemed effective by the SEC on December 15, 2016 (collectively, the "Registration Statement"). The Registration Statement was signed by Defendants Schrömgens and Hefer.

15.     On December 16, 2016, Trivago opened trading on its IPO and filed its final Form 424B4 Prospectus (the "Prospectus") with the SEC.   In its Prospectus, the Company outlined its standards regarding marketing, sales and advertising, stating, in pertinent part, as follows:

> We also intend to continue growing our number of direct relationships with hotels, thereby increasing the volume and quality of information we can provide to travelers.
>
> ***
>
> Our ability to provide pricing transparency by identifying the lowest available rates from our advertisers is driven in part by the large number of advertisers on our marketplace.
>
> ***
>
> We believe that building and maintaining the trivago brand and   clearly articulating our value proposition will drive both travelers and advertisers to our platform. We focus our marketing teams and spend towards building effective messaging to a broad audience.
>
> ***
>
> We are active in online performance marketing channels, continuously optimizing each advertisement through dedicated tests.
>
> ***

4

> We have dedicated sales teams that manage the process of onboarding advertisers, maintain ongoing relationships with over 200 advertisers as of September 30, 2016, work with advertisers to ensure they are optimizing their outcomes from the trivago platform and provide guidance on additional tools and features that could further enhance advertisers' experience. We seek to provide tailored advice to each of our advertisers, and thus have dedicated sales teams for OTAs, hotel chains and independent hotels.

16.     The Prospectus detailed how advertising and referrals are crucial components of the Company's overall revenue growth and explained how revenue per qualified referral ("RPQR") is "a key financial metric that describes the quality of [the Company's] referrals, the efficiency of our marketplace and, as a consequence, how effectively we monetize our users," stating, in pertinent part, as follows:

> We earn substantially all of our revenue when users of our websites and apps click on hotel offers in our search results and are referred to one of our advertisers. We call this our referral revenue. Each advertiser determines the amount that it wants to pay for each referral by bidding for advertisements on our marketplace. We also earn subscription fees for certain services we provide to advertisers, although such subscription fees do not represent a significant portion of our revenue.

> Key metrics we use to monitor our revenue include return on advertising spend, or ROAS, the number of qualified referrals we make and the revenue we earn for each qualified referral, or RPQR.

> \*\*\*

> We believe the primary factors that drive our qualified referral development are the number of visits to our websites and apps, the booking intent of our visitors, the number of available hotels on our hotel search platform, content (the quality and availability of general information, reviews and pictures about the hotels), hotel room prices (the price of accommodation as well as the number of price sources for each accommodation), hotel ratings, the usability of our websites and apps and the degree of customization of our search results for each visitor. Ultimately, we aim to increase the number of qualified referrals we generate by focusing on making incremental improvements to each of these parameters. In addition

to continuously seeking to expand our number of relationships with hotel advertisers, we partner with such hotels to improve content, and we constantly test and improve the features of our websites and apps to improve the user experience, including our interface, site usability and personalization for each visitor.

17.    In its Prospect and Registration Statement, the Company reported a 5% decrease in RPQR for full-year 2016. The Company attributed the decrease to the introduction of a new hotel-level CPC bidding system in 2015, stating, in pertinent part, as follows:

The decrease in RPQR was primarily due to the introduction of hotel-level CPC bidding and the change in the mechanics of the marketplace in early 2015. After a period of bidding adjustments and tests by our advertisers, which led to very high CPC bids, the marketplace adapted to the new bidding functionality during the course of 2016, which resulted in increased and more efficient bidding by our advertisers and higher customer value due to more competitive RPQR levels.

18.    On December 21, 2016, the Company completed its IPO, issuing 30,026,635 shares and raising net proceeds of approximately $212 million.

**DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS**

19.    On February 24, 2017, Trivago issued a press release announcing the Company's financial and operating results for the quarter and year ended December 31, 2016, highlighting a 53% increase in revenue as compared to year end 2015. The Company attributed its "rapid growth" to "the opportunity to invest in advertising above fourth quarter 2015 levels." Defendant Schrömgens further espoused the Company's success, stating, in pertinent part, as follows:

In our first quarter reporting as a public company, we're encouraged by our strong revenue growth and increased profitability. We will continue to test, learn and refine our long-term growth drivers-through the smart allocation of ad spend, increased presence in fast growing markets and focus on building our entrepreneurial team.

20.    In the February 24 press release, the Company again reported the decreased RPQR, stating, in pertinent part, as follows:

> RPQR was down 5% in full year 2016. This was due to high RPQR across all segments in the first half of 2015 following the introduction of hotel-level CPC bidding in early 2015. This drove an initial increase in RPQR in the first half of 2015, followed by a slight decrease and subsequent stabilization during the second half of the year which continued throughout the year 2016.

21.    On March 1, 2017, Trivago conducted its first earnings call with investors to discuss the financial reports for the quarter and year ended December 31, 2016. Defendant Hefer fielded questions from analysts regarding the Company's commercialization and RPQR growth, the exchange, in pertinent part, went as follows:

**Brian Nowak - Morgan Stanley - Analyst**

Thanks for taking my questions, I have two. The first one, and I apologize it is a simple question, but can you just explain the commercialization issue a little bit more in detail kind of what happened? Is that one of the drivers of the US -- I guess the US revenue and the qualified referrals were light but the RoW was better. Just talk about commercialization and what happened in the US in the quarter. And bigger picture, if we kind of step back, how do you think about the mix of your business over time between branded SEM and SEO to kind of get to your long-term target margins? Thanks.

**Axel Hefer - Trivago - CFO, Managing Director**

So let me just repeat the question. So the question is, what the details are behind the comment on the improved commercialization in the US and whether that is an effect we not only see in the US but also in the other markets. So as I said, I mean, we continuously are optimizing our marketplace algorithms, and there are many small things that we continuously do. So it is a bit difficult to give you the technical detail and some of these tests are -- show a little of effect in the short-term and then normalize over time as there is just an initial reaction of the advertisers, and then they get used to

it in a way and the bidding is normalizing. Some of them have a lasting effect because they overall improve the liquidity of the marketplace; and as a result, improve our commercialization, which is just another term for our share of the overall value that we are creating. And so the marketplace algorithms are global so absolutely, that thanks for pointing that out. I did not make that clear enough. But in the -- the changes in that test that we have been running in the fourth quarter, the effect that we saw was just greater in the US. And that is not uncommon, that you have different reactions in different markets given that the structures are very different, the competitive dynamics are very different by platform, by market. So that is something that is typical. But yes, in this case, as I said, in Americas the effect was greatest. But, we are still conservative to see whether that is really a lasting effect.

*** 

**Lloyd Walmsley - Deutsche Bank - Analyst**

Thanks. Two, if I can. First, just following up on Brian's question around commercialization changes. Hoping you can give us a bit more color on what drove that. Was that something like a higher number of clicks per user that drove the higher RPQR for more of a change in sort order, or something that drove the auction dynamics? Anything more you could share there would be helpful. And then a second one, curious if you think that getting hotel loyalty prices distributed to trivago is something that would be helpful for your customers or something that you are talking to hotel chains about at all? Anything you can share there would be helpful.

**Axel Hefer - Trivago - CFO, Managing Director**

Yes. So, to come to your first question, a bit more detail on the commercialization, whether that was driven by more clicks. So when you look at the revenue per qualified referral rate there, there are three drivers. One is the booking conversion, second one is the booking value, and the third one is really our revenue share, which we describe as commercialization.

So, and that in the short-term can be influenced by triggering more clicks, but is very quickly then adjusting as long as the booking value behind the clicks is not going up in-line; because otherwise, the profitability of us as a channel for advertisers would come down and they would adjust their bids. So the tests that we are doing there are more targeted at increasing the liquidity of the marketplace, because that leads -- the more liquid it is, the fairer,

in a way, our share of the overall value that we create is. So the way to think about that is more to optimize the algorithm in a way that every advertiser is well-equipped and has a fair opportunity to participate in the marketplace.

22.     On March 9, 2017, Trivago filed an Annual Report on Form 20-F for the quarter and fiscal year ended December 31, 2016 with the SEC (the "2016 20-F"). The Company reported a 53% increase in revenue, but a 4.8% decrease in RPQR, as compared to year end 2015. The Company explained that the decreased RPQR, specifically in the Americas sector, was simply "a consequence of [] product optimization."

23.     In the 2016 20-F, the Company expounded on its success in attracting advertisers by offering "innovative" services, stating, in pertinent part, as follows:

> Additionally, our ability to refine user intent through our search function allows us to provide advertisers with transaction-ready referrals.

> ***

> Recognizing that advertisers on our marketplace have varying objectives and varying levels of marketing resources and experience, we provide a range of services to enable advertisers to improve their performance on our marketplace.

> ***

> We enable hotel advertisers to advertise offers for each individual hotel. By placing bids in our CPC-based bidding system, each advertiser can influence the likelihood that traffic is driven to its own platform. Advertisers can reach a broad global audience while generating targeted, transaction-ready referrals.

24.     The 2016 20-F contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by Defendants Schrömgens and Hefer, stating that the financial information contained in the 2016 20-F was accurate and disclosed any material changes to the Company's internal control over financial reporting.

25.    On April 27, 2017, Trivago announced that it was increasing its full-year 2017 guidance. Defendant Hefer stated that the Company "now expect[s] annual revenue growth to be around 50%" and attributed the increase in guidance to the Company's "strong start to the year." Defendant Hefer further outlined that there was a "strong focus on improving [the Company's] hotel search product and market leading innovation."

26.    On May 15, 2017, Trivago issued a press release and filed a quarterly report on Form 6-K with the SEC reporting the Company's financial and operating results for the quarter ended March 31, 2017 (the "Q1 2017 6-K"). The Company reported a 68% increase in revenue as well as a 4% increase in RPQR, as compared to the first quarter in 2016. The Company attributed this growth primarily to the introduction of its new relevance assessment, stating, in pertinent part, as follows:

> In the first quarter of 2017, Revenue per Qualified Referral (RPQR) increased by 4% compared to the first quarter of 2016. All segments showed consistent growth rates around 6%, which is higher than the consolidated average of 4% due to the increased weighting of the lower RPQR in our RoW segment in 2017. ***This growth was largely driven by the introduction of a relevance assessment in our marketplace algorithm in December 2016***, which assesses the quality of users' experience after leaving our website. In some cases, advertisers have compensated for their lower relevance assessments through higher cost-per-click bids. We expect that, as advertisers optimize their websites and bidding strategy, these positive revenue effects will be partially mitigated over time.

27.    On July 27, 2017, Trivago issued a press release confirming its full-year 2017 guidance. The confirmation was premised upon the continued referral revenue growth generated by the Company's new relevance assessment. Defendant Hefer reiterated the positive outlook for the remainder of 2017, stating that the Company will "continue to expect annual revenue growth to be around 50% in 2017." The press release stated, in pertinent part, is as follows:

Our decision to confirm our guidance is based on several expectations and assumptions for the year:

- Robust growth in referral revenue over the first two quarters has not only been driven by volume growth but also by positive revenue effects from the introduction of our relevance assessment. We expect revenue per qualified referral (RPQR) to show normalized levels in the second half of 2017 and a positive long-term effect through an improved user experience

- We are optimizing our performance marketing investment mix as part of our ongoing efforts to drive bookings and create long-term value for our advertisers. These adjustments will slow down qualified referral growth in the near term but are intended to have a long-term positive impact on RPQR

- As a consequence, we expect our revenue growth to be more weighted to the first half of 2017 averaging out at around 50% for the full year 2017

28.     On August 4, 2017, Trivago issued a press release and filed a quarterly report on Form 6-K with the SEC reporting the Company's financial and operating results for the quarter ended June 30, 2017 (the "Q2 2017 6-K"). The Company again reported a significant increase in revenue as well as a 5% increase in RPQR, as compared to the second quarter in 2016. The Company again attributed the increased growth in RPQR to its new relevance assessment, stating, in pertinent part, as follows:

We generate revenues primarily on a "cost-per-click," or CPC, basis, whereby an advertiser is charged when a user clicks on an advertised rate for a hotel and is referred to that advertiser's website where the user can complete the booking.

***

During the second quarter of 2017, Revenue per Qualified Referral (RPQR) continued to be positively impacted by the introduction of the relevance assessment in our marketplace algorithm…. during the final weeks of June 2017, cost-per-click bids normalized as most of our advertisers optimized their websites and bidding strategy in response to the introduction of the relevance assessment.

11

29.     During the August 4 earnings call with analysts, Defendant Hefer discussed the impact of the new relevance assessment on the RPQR, stating, in pertinent part, as follows:

> As anticipated advertisers reacted to our relevance assessment at the end of the second quarter, as a result, the revenue per qualified referral levels normalized. This reaction has led to an improved user experience, while we expect - which we expect to improve retention going forward.
>
> ***
>
> So the impact of the relevance assessment that we talked about last quarter already we saw pretty much with the same effect in the second quarter and we expect the revenue per qualified referral to basically go back to old levels, yeah. So this positive effect that we had in Q1 and Q2 to go away for the full third and fourth quarter.

30.     The statements referenced in ¶¶ 14-28 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants failed to disclose that the RPQR growth generated by Trivago's new relevance assessment was unsustainable and would decrease significantly as bidders optimized their websites in response to Trivago's algorithm change. As a result, Trivago's public statements were materially false and misleading throughout the Class Period.

31.     On August 4, Trivago's ADR price fell $2.58, or 13%, on unusually high trading volume. However, Defendants' misleading reassurances and continued positive statements about the Company's business prevented a more substantial decline in Trivago's stock price.

**THE TRUTH IS REVEALED**

32.     On September 6, 2017, less than two months after confirming its full-year 2017 guidance, Trivago issued a press release lowering its 2017 guidance by 10%, stating, in pertinent part, as follows:

trivago N.V. (NASDAQ: TRVG), a leading global hotel search platform, today updated its annual guidance for the fiscal year 2017, based on its expectation that results for the third quarter and the remainder of the year will be softer than previously anticipated.

For the full fiscal year 2017, we now expect annual revenue growth to be around 40% and adjusted EBITDA to be lower than in 2016 but to remain positive.

The changes to our full-year guidance are due primarily to the following two factors:

Revenue per Qualified Referral (RPQR) related impacts:

- The anticipated negative impact on RPQR that we discussed on our second quarter 2017 earnings call has been more significant than previously expected.

- As a result of this impact, we have algorithmically pulled back our performance marketing activities more than previously anticipated, which has resulted in a further slowdown in traffic and revenue growth from those channels

33.     On this news, Trivago's ADR share price fell more than 16% to close at $12.49 on extremely high volume.  The stock price continued to decline in the days following the announcement.

34.     On October 25, 2017, Trivago issued a press release and filed a quarterly report on Form 6-K with the SEC reporting the Company's financial and operating results for the quarter ended September 30, 2017 (the "Q3 2017 6-K"). The Company again lowered its full-year guidance for 2017 to 36-39% and reported a 3% decrease in RPQR from Q2 2017.  The Company attributed the decrease in RPQR to "lower commercialization," stating that the "RPQR in the third quarter of 2017 reflected a downward adjustment in cost-per-click bids and increased volatility after advertisers responded to the introduction of the relevance assessment." The decrease in RPQR was a stark difference to the purported positive impact the relevance

assessment had on RPQR in the second quarter and the expected "normalized" numbers promised by Defendants.

35.      On this news, Trivago's ADR share price again fell $1.58, or approximately 16%, on high trading volume.

36.      On October 27, 2017 the United Kingdom's Competition and Markets Authority ("CMA") announced an investigation into hotel comparison websites, including Trivago, citing concerns about the clarity, accuracy and presentation of information on sites, which could be misleading to customers. Specifically, the CMA is investigating the manner in which hotel comparison websites display information to customers and stated it would examine how hotels were ranked, whether results were influenced by how much commission a hotel pays over the customer's requirements, the use of "pressure selling," and hidden charges.

37.      To date, Trivago's share price has dropped more than 35% since its IPO.

38.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's shares, Plaintiff and other Class members have suffered significant losses and damages.

**DEFENDANTS' ISSUED A FALSE AND MISELADING REGISTRATION STATEMENT IN VIOLATION OF SECTION 11**

39.      Item 303 of SEC Regulation S-K requires the Management's Discussion & Analysis ("MD&A") section of registration statements to "[d]escribe any unusual or infrequent events or transactions . . . that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected" and "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."17 C.F.R. 229.303(a)(3)(i)-(ii).

14

40.     The SEC has provided guidance concerning the MD&A requirements, including Item 303: The purpose of MD&A is not complicated. It is to provide readers information "necessary to an understanding of [a company's] financial condition, changes in financial condition and results of operations." The MD&A requirements are intended to satisfy three principal objectives:

      a.      to provide a narrative explanation of a company's financial statements that enables investors to see the company through the eyes of management;

      b.      to enhance the overall financial disclosure and provide the context within which financial information should be analyzed; and

      c.      to provide information about the quality of, and potential variability of, a company's earnings and cash flow, so that investors can ascertain the likelihood that past performance is indicative of future performance. [SEC Interpretation, *Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, Release Nos. 33-8350, 34-48960, FR-72 (Dec. 29, 2003).]

41.     To effectuate that purpose, Item 303 requires "companies to provide investors and other users with material information that is necessary to an understanding of the company's financial condition and operating performance, as well as its prospects for the future."

42.     The Registration Statement failed to provide the information required by Item 303, including the omission of information necessary to understand the Company's financial condition, changes in financial condition, and results of operations.

43.     Defendants' failed to disclose in its IPO documents that the Company was implementing modifications to its market algorithm and that there was a discernible trend that

showed RPQR would be temporarily inflated following the changes. Changes to the Company's market algorithm resulted in bidders placing higher bids to remain atop Trivago's search results until the bidders optimized their websites to match Trivago's new algorithm.

44.     In December 2016, Trivago changed its market algorithm but did not disclose the change until May 2017, and failed to disclose the impact this change had on artificially inflating RPQR during the first half of 2017 until August 4, 2017.

## NO SAFE HARBOR

45.     Most of the false and misleading statements related to existing facts or conditions, and the Safe Harbor provisions have no applicability to such statements.  To the extent that known trends should have been included in the Company's financial reports prepared in accordance with GAAP, they too are excluded from the protection of the statutory Safe Harbor. 15 U.S.C. §78u-5(b)(2)(A).

46.     Trivago's "Safe Harbor" warnings accompanying its reportedly forward-looking statements issued during the Class Period were also ineffective to shield those statements from liability.   The Defendants are liable for any false or misleading forward-looking statements because, at the time each forward-looking statements was made, the speaker knew the forward-looking statements was false or misleading and the forward-looking statements was authorized and/or approved by an executive officer and/or director of Trivago who knew that the forward-looking statements was false.  In addition, the forward-looking statements were contradicted by existing, undisclosed material facts that were required to be disclosed so that the forward-looking statements would not be misleading.  Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

## ADDITIONAL SCIENTER ALLEGATIONS

47.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Trivago, their control over, and/or receipt of modification of Trivago's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Trivago, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

48.    At all relevant times, the market for Trivago's shares was an efficient market for the following reasons, among others:

a.    Trivago's shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.    as a regulated issuer, Trivago filed periodic public reports with the SEC;

c.    Trivago regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Internet and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

17

d.      Trivago is followed by many securities analysts who wrote reports that were distributed during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

e.      unexpected material news about Trivago was rapidly reflected in and incorporated into the Company's ADR price during the Class Period.

49.      As a result of the foregoing, the market for Trivago shares promptly digested current information regarding Trivago from publicly available sources and reflected such information in Trivago's stock price.  Under these circumstances, all purchasers of Trivago shares during the Class Period suffered similar injury through their purchase of Trivago shares at artificially inflated prices, and a presumption of reliance applies.

**LOSS CAUSATION**

50.      During the Class Period, as detailed herein, Defendants made false and misleading statements, and omitted material information, concerning Trivago's business fundamentals and financial prospects and engaged in a scheme to deceive the market.

51.      By artificially inflating and manipulating Trivago's shares price, Defendants deceived Plaintiff and the Class and caused them losses when the truth was revealed. Defendants' prior misrepresentations and fraudulent conduct became apparent to the market on October 27, 2017, causing Trivago's shares price to fall precipitously as the prior artificial inflation came out of the stock price.  As a result of their purchases of Trivago shares during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

52.     This is a class action on behalf of those who purchased or otherwise acquired Trivago shares between December 16, 2016 and October 27, 2017, inclusive, excluding Defendants (the "Class").  Excluded from the Class are officers and directors of the Company as well as their families and the families of the Defendants.  Class members are so numerous that joinder of them is impracticable.

53.     Common questions of law and fact predominate and include whether Defendants: (a) violated the Securities Act and the Exchange Act; (b) omitted and/or misrepresented material facts; (c) knew or recklessly disregarded that their statements were false; (d) artificially inflated the price of Trivago shares; and (e) the extent of and appropriate measure of damages.

54.     Plaintiff's claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiff will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Against Trivago and the Individual Defendants

55.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

56.     Throughout the Class Period, Defendants Trivago and the Individual Defendants, in pursuit of their scheme and continuous course of conduct to inflate the market price of Trivago shares, had the ultimate authority for making, and knowingly or recklessly made, materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

19

57.    During the Class Period, Defendants Trivago and the Individual Defendants, and each of them, carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period did: (a) artificially inflate and maintain the market price of Trivago shares; (b) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (c) cause Plaintiff and other members of the Class to purchase Trivago shares at inflated prices; and (d) cause them losses when the truth was revealed. In furtherance of this unlawful scheme, plan and course of conduct, Defendants Trivago and the Individual Defendants, and each of them, took the actions set forth herein, in violation of §10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. §240.10b-5.

58.    In addition to the duties of full disclosure imposed on Defendants Trivago and the Individual Defendants as a result of their affirmative false and misleading statements to the investing public, these Defendants had a duty to promptly disseminate truthful information with respect to Trivago's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market price of the Company's shares would be based on truthful, complete and accurate information.  SEC Regulations S-X (17 C.F.R. §210.01, *et seq*.) and S-K (17 C.F.R. §229.10, *et seq*.).

59.    Defendants Trivago and the Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were either known or readily available to them.

60.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of Trivago shares was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Trivago shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made knowingly or with deliberate recklessness by Defendants Trivago and the Individual Defendants, or upon the integrity of the market in which the shares traded, Plaintiff and other members of the Class purchased Trivago shares during the Class Period at artificially high prices and, when the truth was revealed, were damaged thereby.

61.     Had Plaintiff and the other members of the Class and the marketplace known of the true facts, which were knowingly or recklessly concealed by Defendants Trivago and the Individual Defendants, Plaintiff and the other members of the Class would not have purchased or otherwise acquired their Trivago shares during the Class Period, or if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

62.     By virtue of the foregoing, Defendants Trivago and the Individual Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  17 C.F.R. §240.10-5.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

63.     Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

64.     The Individual Defendants had control over Trivago and made the material false and misleading statements and omissions on behalf of Trivago within the meaning of §20(a) of

the Exchange Act as alleged herein.  By virtue of their executive positions and stock ownership, as alleged above, the Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and misleading.  The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

65.    In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

66.    By reason of such wrongful conduct, each of the Individual Defendants is liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

## COUNT III

### For Violation of §11 of the Securities Act
### Against the Securities Act Defendants

67.    Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein. This Count III does not incorporate any allegation of fraud, recklessness or intentional conduct.

68.    The Registration Statement for the IPO and those documents and disclosures incorporated therein by references, were materially false and misleading; contained untrue

statements of material facts; omitted to state material facts necessary to make the statements made in the Registration Statement not misleading; and/or failed to adequately disclose material facts.

69.     The Individual Defendants were responsible for the contents of the Registration Statement and caused its filing with the SEC.  The Individual Defendants signed the Registration Statement, consented to being named therein as officers of Trivago, and caused it to be prepared and filed with the SEC.

70.     The Underwriter Defendants each acted as an underwriter in the sale of stock in the IPO, directly and indirectly participated in the distribution of the stock in the IPO, and directly and indirectly participated in drafting and disseminating the offering documents for the stock in the IPO.

71.     As issuer of the securities, Trivago is strictly liable to Plaintiff and the Class for the misstatements and omissions.

72.     Neither of the Individual Defendants or the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements, contained in the Registration Statement, and described herein, were true, were without omissions of any material facts, and/or were not misleading.

73.     Plaintiff and the other members of the Class each acquired Trivago ADRs issued pursuant to the Registration Statement.

74.     At the time the acquired Trivago shares pursuant to the Registration Statement, neither Plaintiff nor any member of the Class knew, or by the exercise of reasonable care could have know, of the facts concerning the material misstatements and/or omissions alleged herein.

75.    By reasons of the foregoing, the Securities Act Defendants violated Section 11 of the Securities Act and are liable to Plaintiff and the members of the Class, each of whom has been damaged by reason of such violation.

## COUNT IV

### For Violation of §15 of the Securities Act
### Against the Individual Defendants

76.    Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein. This Count IV does not incorporate any allegation of fraud, recklessness or intentional conduct.

77.    Each of the Individual Defendants was a controlling person of Trivago within the meaning of Section 15 of the Securities Act. Each of the Individual Defendants had the power and authority to cause Trivago to engage in the wrongful conduct complained of herein, including the issuance of the false and misleading Registration Statement.

78.    None of the Individual Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and devoid of any omissions of material facts. Therefore, by reason of their positions of control over Trivago, as alleged herein, each of the Individual Defendants is jointly and severally liable with, and to the same extent as, Trivago to Plaintiff and other members of the Class as a result of the wrongful conduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of the Class, prays for judgment as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: November 7, 2017                    Respectfully submitted,

**GLANCY PRONGAY & MURRAY LLP**

By:    *s/ Lesley F. Portnoy*
Lesley F. Portnoy (LP-1941)
230 Park Ave., Suite 530
New York, New York 10169
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
lportnoy@glancylaw.com

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy
Robert V. Prongay
Casey E. Sadler
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**HOLZER & HOLZER, LLC**
Corey D. Holzer
1200 Ashwood Parkway, Suite 410
Atlanta, Georgia  30338
Telephone:  (770) 392-0090
Facsimile:   (770) 392-0029
cholzer@holzerlaw.com

*Attorneys for Plaintiff*

25

DocuSign Envelope ID: F8E1DBD3-313B-4FF9-87A5-15B3961694A0

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

The undersigned declares, as to the claims asserted under the federal securities laws, that:

Plaintiff has reviewed the initial complaint filed in this action.

Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary. I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

Plaintiff's transactions in the security that is the subject of this action during the Class Period are as follows:

Purchases:

| Name of Company | Date(s) Purchased | # Shares Purchased | Cost/Share |
|---|---|---|---|
| TRVG | 06/29/2017 | 450 | $21.3566 |
| | 08/11/2017 | 300 | $16.1534 |

Sales:

| Name of Company | Date(s) Sold | # Shares Sold | Proceeds/Share |
|---|---|---|---|
| TRVG | 09/15/2017 | 750 | $11.1035 |

During the three (3) years prior to the date of this certification, Plaintiff has not sought to serve or served as a class representative in an action filed under the federal securities laws except for the following (if any):

N/A

DocuSign Envelope ID: F8E1DBD3-313B-4FF9-87A5-15B3961694A0

Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___7th___ day of ___Nov___, 2017 in ____Mariposa____, ____CA____.

City                                    State

(Signature) X _____Jorge Oliva_____

(Print Name)_____Jorge Oliva_____